UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

v.

NOAH MAURICE PETTES,

     Defendant.

Case No. 25-20356
Honorable Laurie J. Michelson

---

**OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS [20]**

---

On April 29, 2025, three Detroit police officers were conducting "proactive patrol" in the City's ninth precinct when they happened upon Noah Pettes. While approaching in their squad car, officers saw Pettes standing next to the open passenger door of a parked vehicle, which was facing the wrong direction on the road. As officers advanced down the street, they saw Pettes perform a "retention" check on the right side of his waistband, open the passenger door wider and step behind it, and "blade" the right side of his body away from the officers. The officers viewed these movements as hallmarks of a person hiding a concealed firearm, so the trio pulled up next to Pettes, exited their squad car, and one almost immediately saw and recovered a gun with an extended magazine from the waistband of Pettes' pants.

While investigating whether Pettes had a license to carry this concealed weapon, the officers handcuffed him and placed him in the back of their squad car. Eventually the officers determined Pettes did not have a license to carry a concealed

weapon and arrested him. Pettes was subsequently charged with one count of being a felon in possession of a firearm pursuant to 18 U.S.C. § 922(g)(1).

Pettes now seeks to suppress the firearm, contending that the officers effectively "arrested" him without probable cause the moment they approached him. (ECF No. 20.) But because the officers were permitted to temporarily detain Pettes while investigating whether he had a CPL, the motion is DENIED.

## I.

The testimony of the officers at the evidentiary hearing (Minute Entry, October 22, 2025) was largely consistent with their police reports (ECF No. 26-2, PageID.90–100) and body camera footage. (ECF No. 26-3, Video Ex. 2, Leavy Bodycam; ECF No. 26-4, Video Ex. 3, Moten Bodycam). It supports the following narrative.

On the evening of April 29, 2025, uniformed Detroit Police Department officers Sergeant Jordan Leavy, Detective Ryan Walden, and Officer Quentin Moten— members of the department's gang intelligence unit—conducted "proactive patrol" in a residential neighborhood within Detroit's ninth police precinct. (*Id.* at PageID.96.) Leavy testified that proactive patrol is a form of policing that involves trying to deter or stop crime before a call is made to law enforcement. In other words, the officers were roving around on the lookout for weapons or drug activity. And they were doing so in one of the highest crime precincts in the city.

Around 6:50 p.m., Detective Walden drove the officers' marked squad car up Elmo Street toward Portlance Street. (ECF No. 20, PageID.48.) Officer Moten sat shotgun; Sergeant Leavy, the rear passenger. (*Id.*) As their car reached the

intersection of Portlance and Elmo Streets, Leavy observed a man to their right on Portlance (later identified as Pettes) standing in the road next to the open passenger door of a green Jeep Compass. (ECF No. 26-2, PageID.96.) The officers noticed that the Compass was parked facing the wrong way—in the direction of oncoming traffic—which is a traffic infraction. (*Id.*) As they continued down Portlance, all three officers saw Pettes do what they identified as a "retention check" (*id.* at PageID.92, 96), a gesture in which a concealed weapon carrier jiggles, taps, or otherwise touches their waistband to ensure their weapon remains secure (*id.* at PageID.96). As the officers continued to drive, Pettes opened the passenger door wider and moved farther behind it—another movement they found suspicious. And as they got closer still, officers saw that the driver and passenger seats of the Jeep were occupied by two women. Finally, as the squad car pulled up parallel to Pettes and the Jeep, the officers saw Pettes "blade" or twist his body away from them and toward the woman in the passenger seat, which they recognized as a tactic often used to hide a concealed weapon. (*Id.; see id.* at PageID.92.)

Believing Pettes might be armed, Moten testified that he asked Pettes through the open passenger window of the squad car if he had a concealed pistol license ("CPL"). (*See* ECF No. 20, PageID.49.) Pettes said yes and that it was in the car.[1] (*Id.*) Walden parked the squad car next to Pettes and all three officers got out. (*See, e.g.,*

---

[1] Although Moten's body-worn camera was not yet recording sound, the video function was rolling for some time. And in that video, one can see from Moten's view out the windshield that the squad car was stationary for several moments before the officers exited (Moten Bodycam, 0:03–0:16), corroborating the testimony that some words were exchanged before officers got out and approached Pettes.

Moten Bodycam, 0:16.) Leavy moved toward Pettes' right side, the side Pettes had "bladed" away and touched during the retention check. (ECF No. 26-2, PageID.96.) Within seconds, Leavy saw the handle of a firearm and the butt of an extended magazine protruding from Pettes' waistband. (*Id.*; *see also* Leavy Bodycam, 0:16–0:20.) As Leavy moved closer to Pettes, he said aloud, "A" or "ay" (Leavy Bodycam, 0:19), which he explained at the hearing is a verbal "indicator" he uses to mark whenever he first sees a weapon or contraband. Pettes, for his part, repeatedly asked the officers why he was being stopped. (*Id.*) Leavy then reached over the passenger-side door and removed the weapon from Pettes' person as Moten simultaneously grabbed Pettes' left arm to restrain him. (*Id.* at 0:20–0:25; Moten Bodycam, 0:17–0:21.) As he retrieved the weapon, Leavy again asked Pettes, "Where's your CPL bro?" (Leavy Bodycam, 0:24–0:26.) When Pettes merely continued to ask why he was being stopped, Leavy explained, "'Cause I see it. When you encounter law enforcement, you gotta tell us you got a CPL." (*Id.* at 0:22–0:30.) Leavy then unloaded Pettes' weapon (*id.* at 0:25–0:55) as Moten and Walden moved Pettes away from the passenger door (Moten Bodycam, 0:30–0:40) and Moten handcuffed Pettes (*id.* at 0:40–0:49). As Pettes continued to ask why he was being handcuffed, Leavy explained, "You got a CPL on you, once we see it, you're on your way." (*Id.* at 0:50–0:55.)

For a minute or so, Leavy and a handcuffed Pettes stood between the squad car and Jeep as they continued to discuss the reason for the stop. Pettes was adamant that he had done nothing wrong, that he was merely reaching for his PlayStation in the car, and that having a gun was "not a crime." (Leavy Bodycam, 0:40–0:47.) Leavy

explained that he saw Pettes "duck in" the car and that having a concealed pistol is a crime "unless you have a CPL," adding, "that's what we're trying to figure out." (*Id.* at 1:38–1:52.)

After this discussion, Leavy seated Pettes in the rear of the squad car, closing the door but leaving the window open. (*Id.* at 1:47–1:50.) Leavy then asked the women in the Jeep if they could find Pettes' ID or CPL. (*Id.* at 1:50–2:00.) The two women began looking around the car as the officers stood by. (*Id.* at 2:10–4:35.) At one point, Pettes instructed the women (through the open squad car window) to look for his wallet in the armrest of the car. (*Id.* at 3:36.) After approximately two and a half minutes of unsuccessful searching, the woman in the passenger seat said to Leavy, "It's not in there." (*Id.* at 4:35.)

At this point, Leavy turned back to Pettes and once again asked if he had a CPL. (*Id.* at 4:40–4:49.) Pettes did not answer the question and again maintained that carrying a concealed weapon is not a crime. (*Id.*) Leavy again explained that absent a CPL, concealed carrying is a crime, adding: "If you have a CPL, you should know that. You obviously don't. I need your name." (*Id.* at 4:50–4:55.)

Pettes refused to give officers his name. (*See id*. at 5:15–5:30.) So, for another several minutes, the officers continued to ask the women in the Jeep (and another man who emerged and stood by, appearing to be an acquaintance of Pettes') if they had Pettes' ID or if they could provide Pettes' name. (*Id.* at 5:30–7:00.)

After a few minutes of unsuccessful attempts to ascertain Pettes' identity, Leavy opened the squad car door and went through Pettes' pants pockets, where he

found a Huntington Bank card with Pettes' name on it. (*Id.* at 7:00–7:35.) Moten then searched Pettes' name in a law enforcement database ("LEIN check") which confirmed that Pettes did not have a license to carry a concealed weapon. (ECF No. 26-2, PageID.92.) Pettes was then arrested (*id.*) and subsequently charged with one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). (ECF No. 1.)

On August 11, 2025, Pettes filed the present motion to suppress the gun and all his statements made after its discovery, contending they were the fruit of an arrest made without probable cause. (ECF No. 20, PageID.47.) Therein, he argues that the officers were "aggressive" and used measures (namely, handcuffing him and placing him in the squad car) that were "not warranted by the circumstances," such that his detention "immediately" rose to the level of an arrest. (*Id.* at PageID.53.) In response, the government argues that Pettes was merely detained pursuant to a lawful *Terry* stop while officers investigated whether he had a CPL. (ECF No. 26.) After a reply from Pettes (ECF No. 27), the motion was fully briefed, and the Court held an evidentiary hearing on the motion (Minute Entry, October 22, 2025).

## II.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. "The Supreme Court has identified three types of reasonable, and thus permissible, warrantless encounters between the police and citizens: (1) consensual encounters in which contact is initiated by a police officer without any articulable

6

reason whatsoever and the citizen is briefly asked questions; (2) a temporary involuntary detention or *Terry* stop which must be predicated upon 'reasonable suspicion;' and (3) arrests which must be based upon 'probable cause'" that the arrestee has committed or is committing a crime. *United States v. Pearce*, 531 F.3d 374, 380 (6th Cir. 2008). This case implicates the latter two.

Under *Terry v. Ohio*, 392 U.S. 1, 88 (1968), an officer may conduct a brief, warrantless stop of an individual "when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). During such a stop, officers may conduct a precautionary "frisk" of the individual to search for weapons, but only if they have a "reasonable suspicion that the person searched may be armed and dangerous." *United States v. McCallister*, 39 F.4th 368, 373 (6th Cir. 2022) (quoting *United States v. Pacheco*, 841 F.3d 384, 390 (6th Cir. 2016)); *see also United States v. Patterson*, No. 22-20269, 2023 U.S. Dist. LEXIS 113797, at *19 (E.D. Mich. June 30, 2023) ("Because the search is 'for the limited purpose of ensuring the safety of the officer and others around him, the search must be confined in scope to an intrusion reasonably designed to discover weapons that could be used to assault the officer.'" (citing *United States v. Stennis*, 457 F. App'x 494, 499 (6th Cir. 2012))). Similarly, officers may use reasonable, temporary measures to detain an individual while conducting such an investigative stop, but only if necessary to protect officer safety or prevent flight. *Houston v. Doe*, 174 F.3d 809, 814–15 (6th Cir. 1999).

7

When a *Terry* stop exceeds reasonable bounds, it may transform into an arrest. *United States v. Avery,* 137 F.3d 343, 349 (6th Cir. 1997) ("An unreasonable duration or unreasonable means [of detention] may convert an investigatory stop into an arrest requiring the more onerous showing of probable cause." (citing *United States v. Place*, 462 U.S. 696, 709 (1983))). As such, officers conducting a *Terry* stop must "diligently pursue a means of investigation likely to confirm or dispel their suspicions quickly." *Id.* (citing *United States v. Sharpe*, 470 U.S. 675, 685–86 (1985)).

Thus, when "examining the constitutionality of a *Terry* stop, a court must address two questions. First, whether there is a proper basis for the stop. The second question is whether the degree of intrusion exceeded the scope of the circumstances." *United States v. Capozzoli*, No. 22-20005, 2022 U.S. Dist. LEXIS 137103, at *5 (E.D. Mich. Aug. 2, 2022). "[When] assessing the stop, [courts] judge the facts against an objective reasonableness standard to decide whether the information available to the officer at the time would warrant a person of reasonable caution to believe that a [stop and] frisk was appropriate." *Stennis*, 457 F. App'x at 499. In conducting this analysis, courts consider "the totality of the circumstances to 'determine whether . . . individual factors, taken as a whole, give rise to reasonable suspicion, even if each individual factor is entirely consistent with innocent behavior when examined separately.'" *Id.* (quoting *United States v. Campbell*, 549 F.3d. 364, 371 (6th Cir. 2008)).

With this background in mind, the Court turns to the officers' detention of Pettes.

### A. *Terry* Investigative Stops

Pettes contends that he was arrested as soon as the officers approached him and thus the entire interaction must be analyzed as an arrest supported by probable cause. (ECF No. 20, PageID.53.) Neither party disputes that, upon the lesser showing of reasonable suspicion, officers may briefly detain a suspect to conduct an investigation. (*Id.* at PageID.52; ECF No. 26, PageID.85–86.) And at the hearing, Pettes could not really dispute that such reasonable suspicion existed here. Instead, the crux of the dispute is the nature of the stop itself: The government says it was a valid *Terry* stop; Pettes says that the officers' aggressive conduct constituted an arrest. So the Court will first analyze whether the officers' detention of Pettes was reasonable in the context of a *Terry* stop, or if, by either its length or manner, the stop transformed into an arrest. *See Houston*, 174 F.3d at 814 ("An investigative *Terry* stop may indeed ripen into an arrest through the passage of time or the use of force."); *see also Brown v. Lewis*, 779 F.3d 401, 414 (6th Cir. 2015) ("When the nature of a seizure exceeds the bounds of a permissible investigative stop, the detention may become an arrest that must be supported by probable cause." (citing *Dorsey v. Barber*, 517 F.3d 389, 398 (6th Cir. 2008))).

"[T]here is no bright line that distinguishes an investigative stop from a *de facto* arrest." *Houston*, 174 F.3d at 814. The use of handcuffs does not automatically convert a permissible *Terry* stop into an arrest. *Hodges v. City of Grand Rapids*, 139 F.4th 495, 516 (6th Cir. 2025) ("We have held that neither 'the use of handcuffs' nor the 'detention in a police cruiser . . . automatically transform a[n] [investigation] stop

into an arrest' . . . ." (alterations and first omission in original)). Nor does placing a suspect in a squad car. *Id.*; *see United States v. Boyett*, 295 F. App'x 781, 785 (6th Cir. 2008) ("Holding subjects at gunpoint, handcuffing them, and placing them in a squad car does not turn a *Terry* stop into an arrest where the police officers 'reasonably fear that suspects are armed and dangerous.'" (quoting *Houston*, 174 F.3d at 815)); *see also United States v. Bridges*, No. 16-20089, 2016 U.S. Dist. LEXIS 95367, at *6 (E.D. Mich. July 21, 2016).

Instead, courts ask whether the "length and manner" of the stop was "reasonably related to the basis for the initial intrusion." *Houston*, 174 F.3d at 814; *see, e.g.*, *Jones v. Long*, No. 22-5955, 2023 U.S. App. LEXIS 20759 (6th Cir. Aug. 9, 2023) ("Once justified, an investigatory stop is reasonable if the 'degree of intrusion into the suspect's personal security was reasonably related in scope to the situation at hand.'" (quoting *Hoover v. Walsh*, 682 F.3d 481, 497 (6th Cir. 2012))); *see also Smoak v. Hall*, 460 F.3d 768, 779 (6th Cir. 2006) ("In other words, the greater the degree of intrusion during a stop, the more solid must be the officer's suspicion that the stopped individual is guilty of wrongdoing."). That less intrusive means of investigation were available but not chosen does not automatically render a stop unreasonable—"the question is not simply whether some other alternative was available, but whether the police acted *unreasonably* in failing to recognize or to pursue it." *Sharpe*, 470 U.S. at 686 (emphasis added). Thus, only when the scope or duration of a stop exceeds reasonable bounds does a temporary investigative detention "transform" into an arrest. *See Avery,* 137 F.3d at 349.

**1. Basis of the Stop**

Consider first the basis for Pettes' stop. Officers approached Pettes because they suspected him of carrying a concealed weapon. Almost immediately upon nearing him, Leavy saw that weapon protruding from Pettes' waistband. (ECF No. 26-2, PageID.96; *see also* Leavy Bodycam, 0:16–0:20.) Because Pettes claimed to be a CPL holder, officers began an investigation to find his CPL—which Michigan law required he have "at all times" he carried a concealed weapon. Mich. Comp. Law § 28.425f (civil code regulating the carrying of concealed pistols); *see also id.* § 750.227(2) (making it a crime to carry a pistol on one's person without a license or, if licensed, without carrying the license as required by law).

So, were the officers' following actions (handcuffing Pettes and putting him in the squad car) "reasonably related" to investigating whether Pettes was lawfully carrying a concealed weapon? Undoubtedly. These precautions enabled officers to investigate whether Pettes had a CPL in a safe and orderly manner. (*See, e.g.*, Leavy Bodycam, 1:55–2:00 (Leavy and Pettes' friends calmly discussing Pettes' CPL and ID); *id.* at 2:00–4:37 (Pettes' friends looking for his CPL for several minutes without conflict).) And while Leavy acknowledged that it would have been difficult for Pettes to flee from the officers once stopped, he noted it was not impossible. Indeed, it is not uncommon for individuals suspected of carrying illegal weapons to flee from police. *See, e.g.*, *United States v. Morris¸* No. 24-20339, 2025 U.S. Dist. LEXIS 8729, at *4 (E.D. Mich. Jan. 16, 2025); *United States v. Ulmer*, No. 21-20708, 2024 U.S. Dist. LEXIS 127039, at *5 (E.D. Mich. July 18, 2024); *United States v. Steen*, No. 21-20012,

2021 U.S. Dist. LEXIS 206889, at *3 (E.D. Mich. Oct. 27, 2021). Detaining Pettes ensured the investigation could be completed.

At the hearing, Pettes suggested that detaining him while searching for his CPL was counterproductive to actually finding it; that is, by placing him in the squad car, Pettes was unable to look for the CPL himself. But Pettes points to no authority, nor is this Court aware of any, that says detention is only "reasonably related" to the purposes of an investigation if it makes the investigation more efficient. To the contrary, precedent says officers need not choose the best or most efficient method of investigating—only a reasonable one. *See Sharpe*, 470 U.S. at 686 ("A creative judge engaged in *post hoc* evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished. But '[the] fact that the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, by itself, render the search unreasonable.'" (quoting *Cady v. Dombrowski*, 413 U.S. 433, 447 (1973))). And as a factual matter, Pettes' temporary detention did not actually impede his ability to assist with finding the CPL in the small confines of an automobile—as the two women in the Jeep searched for his CPL, Pettes called out through the squad car window that they should check the armrest. ([Leavy Bodycam, 3:36). So the theory that Pettes could have helped the officers find his supposed CPL more quickly if he was not physically detained fails to untether the purpose of his detention (to ascertain the existence of a CPL in a safe and orderly fashion) from the basis of the stop (to investigate whether he was unlawfully carrying a concealed weapon).

## 2. Manner and Duration of the Stop

Turning to part two of the analysis, the Court finds that the manner and duration of Pettes' detention were reasonable in the context of the *Terry* stop.

First, the manner of Pettes' detention. Contrary to Pettes' assertions (ECF No. 20, PageID.47, ECF No. 27, PageID.109; PageID.53, PageID.57), officers were not physically aggressive as they investigated him. Naturally, they touched his arms as they seized the gun and handcuffed him. *See Graham v. Connor*, 490 U.S. 386, 396 (1989) ("[T]he right to make an . . . investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." (citing *Terry*, 392 U.S. at 22–27)). But the methods of detention this Circuit has deemed "unreasonable" go far beyond mere arm touching. For example, throwing a suspect on the ground and placing a knee on his back, *Brown*, 779 F.3d at 408 (finding that throwing suspect to the ground exceeded "reasonable" scope of *Terry* investigation and became an arrest), or yelling at a suspect to place his hands on his head and slamming him into the hood of his car, *(Koezler v. Westrick*, No. 22-1835, 2024 U.S. App. LEXIS 11287, at *11–12 (6th Cir. May 7, 2024)) (finding in § 1983 excessive force case that a jury could find a *Terry* stop transformed into an arrest when officers "slamm[ed]" the suspect into the hood of his car, kneed him to the ground, and applied a pressure point to his eye).

Moreover, officers were reasonable in treating Pettes as "armed and dangerous," because Pettes was, in fact, armed. *See, e.g.*, *Patterson*, 2023 U.S. Dist. LEXIS 113797, at *21–22 (crediting officer testimony that "the suspect's ready access

13

to a firearm can pose a danger" while officers investigate if a suspect has a CPL). Pettes resists this conclusion by arguing that once he was disarmed, the officers no longer had justified safety concerns, and his detention was therefore unnecessary. He adds that simply carrying a concealed weapon did not make him so "inherently dangerous" as to necessitate his detention after the weapon was retrieved. True, officers seized Pettes' weapon shortly after encountering him, but they were justified in exercising precaution even after disarming Pettes. They were investigating a person who had a high-capacity magazine on a concealed weapon, in an area in which shootings were common, with bystanders in the immediate vicinity, and did not yet know if Pettes may have had other weapons on or near his person.

Pettes further contends that absent any other conduct that would lead officers to believe he was a danger (like threatening or assaulting them), the officers should not have assumed Pettes was dangerous based on the nature of his suspected crime alone. But the Sixth Circuit did just that in *Cook v. Boss*, finding that because "auto thieves sometimes carry guns," it was reasonable for officers to temporarily handcuff and detain Cook, who was suspected of auto theft, while they determined whether the car he was driving was stolen—even though officers had no other reason to suspect Cook had a gun or posed a danger to them. No. 24-3350, 2025 U.S. App. LEXIS 1966, at *14–15 (6th Cir. Jan. 27, 2025). The same was also true in *United States v. Heath*, 259 F.3d 522, 531 (6th Cir. 2001), where the court again reasoned that, since weapons are often used in drug transactions, officers could assume a suspected drug dealer had weapons, absent any specific facts to that effect. *See also*

14

*Wright v. City of Euclid,* 962 F.3d 852, 866 (6th Cir. 2020) (describing the reasoning in *Heath* as a "'drug activity = guns' premise"). Indeed, the Sixth Circuit has expressly recognized that "[t]hough some crimes may not directly involve violence, they may be so closely associated with violence as to support an inference of dangerousness that justifies intrusive measures during the investigatory stop." *Brown*, 779 F.3d at 415. This includes detaining an individual carrying a concealed semi-automatic firearm with an extended capacity magazine who is unable to promptly produce a CPL.

Numerous judges in this district have reached the same result, finding that handcuffing and physically detaining someone while investigating whether they have a CPL is a reasonable safety measure. *See, e.g.*, *Bridges*, 2016 U.S. Dist. LEXIS 95367, at *17–18 ("Once detained, officer Townsend seized the handgun from the defendant, handcuffed him, confined him in the patrol car, and checked his computer to determine if the defendant had a CPL. . . . The officers did not detain the defendant for any longer than necessary to investigate whether he was carrying a firearm lawfully."); *see also United States v. Foster*, No. 23-20464, 2024 U.S. Dist. LEXIS 19085, at *3 (E.D. Mich. Feb. 2, 2024) (holding that officers acted reasonably during their *Terry* stop of Foster); *United States v. Foster*, No. 23-20464 (E.D. Mich. Jan. 16, 2024), ECF No. 28, PageID.140–144 (describing that *Terry* stop of Foster and explaining that officers handcuffed Foster, then seized a firearm from his person, then placed him in a squad car after he stated he could not produce a CPL because he did not have his wallet with him); *United States v. Edwards*, No. 19-20479, 2019 U.S. Dist. LEXIS 185987, at *13–14 (E.D. Mich. 2019) (finding that officers could

reasonably handcuff and place a person suspected of carrying an illegal weapon in a squad car *even before* seeing any evidence of a weapon, assuming that such a person could be dangerous); *Patterson*, 2023 U.S. Dist. LEXIS 113797, at *14 (reasoning that investigative detention may be justified where a suspect is "engaging in the presumptively unlawful behavior of concealing a firearm").

Turning next to the length of Pettes' detention, this, too, was reasonable. After seizing Pettes' weapon for their safety, the officers handcuffed and detained Pettes in the squad car for a matter of minutes while investigating Pettes' CPL. And Pettes was told, at the outset of his detention, that he would be free to leave if and when he produced the CPL he claimed to have—Leavy explained several times that the sole purpose of Pettes' detention was to "figure out" if he had a CPL (Leavy Bodycam, 1:38–1:52) and that the ordeal would be over once he produced it (*id.* at 0:50–0:55). *See United States v. Turner*, No. 23-20284, 2024 U.S. Dist. LEXIS 115725, at *11–12 (E.D. Mich. July 1, 2024) ("The officers' perceptions of seizure, and whether they would have let Turner leave, are relevant to the inquiry 'only to the extent that that intent has been conveyed to the person confronted.'" (quoting *Michigan v. Chesternut*, 486 U.S. 567, 575 n.7 (1988))).

To sum up: the Court finds that, under the totality of the circumstances, the officers' investigative detention of Pettes was reasonable in both length and manner and reasonably related to the purpose for the stop. As such, the *Terry* stop did not "transform" into an arrest until officers determined Pettes' lacked a CPL.

## III.

Having found that Pettes' temporary detention pursuant to a *Terry* stop was reasonable, the Court next considers whether that *Terry* stop was, in the first instance, supported by reasonable suspicion. That is, at the moment Pettes was seized, did the officers have reasonable suspicion that he was in unlawful possession of a concealed weapon? To answer that question, the Court begins with identifying the moment at which Pettes was "seized" within the meaning of the Fourth Amendment. *See Robinson v. Howes*, 663 F.3d 819, 827 (6th Cir. 2011) ("We look first to the moment Petitioner was actually 'seized,' thereby implicating the Fourth Amendment, to determine if the seizure was justified by reasonable suspicion.").

### A. Moment of Seizure

A person is "seized" within the meaning of the Fourth Amendment when, by "means of physical force or a show of authority," *United States v. Mendenhall*, 446 U.S. 544, 553 (1980), an officer has "in some way restrained his liberty," *Terry*, 392 U.S. at 19 n.16, such that a reasonable person in his shoes would not feel free to leave. *United States v. Johnson*, 620 F.3d 685, 690 (6th Cir. 2010). Moreover, when an individual claims to have been seized by a show of authority (rather than physical force), he must have actually yielded to that authority to be "seized." *Brendlin v. California*, 551 U.S. 249, 254, (2007); *California v. Hodari D.*, 499 U.S. 621, 626 (1991). "To guide this circumstances-based inquiry, the Supreme Court has identified some factors that may indicate a seizure: 'the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person . . . , or the

17

use of language or tone of voice indicating that compliance with the officer's request might be compelled.'" *Turner*, 2024 U.S. Dist. LEXIS, at *10 (omission in original) (quoting *Mendenhall*, 446 U.S. at 554).

The fast sequence of events here (less than 30 seconds between the officers' turn onto Portlance and their discovery of Pettes' gun) makes the exact moment of seizure difficult to parse. But the Court finds that Pettes was not restrained by physical force (Moten grabbing both his arms) until after Leavy indicated he saw the gun. (Leavy Bodycam, 0:19 (Leavy saying "A," (or, "ay") indicating he saw the gun); Moten Bodycam, 0:25–0:35 (Moten moving Pettes' body to grab his right arm after Leavy withdrew the gun from Pettes' waistband).) While it appears that Leavy briefly grabbed Pettes' right arm when he first saw and reached for the gun (Leavy Bodycam, 0:19), this contact was so brief (merely a second) and limited in purpose (to retrieve the spotted gun) that it is more appropriately considered a touch incidental to securing the weapon and not a meaningful restriction of Pettes' freedom. *See Terry*, 392 U.S. at 19 n.16 (noting that an officer's "initiation of physical contact for the purposes of searching Terry for weapons" did not by itself intrude on his "constitutionally protected rights"). And before that point, officers had not meaningfully restricted Pettes' freedom through a show of authority, nor had Pettes "yielded" to any such showing. This conclusion is supported by several observations.

First, as the officers exited their vehicle, Pettes maintained somewhat relaxed body language, kept hold of the backpack in his hands and slightly shifted away from Moten as he first approached. (Moten Bodycam, 0:16–0:19); *cf. Johnson*, 620 F.3d at

690–92 (finding that the suspect was seized when he "braced" himself against the passenger door of his car, as if to stay in place, and stopped moving as officers told him to "stop").

Second, the officers did not yell or bark sharp demands at Pettes. (*See, e.g.*, Moten Bodycam, 0:19–0:20 (Moten saying to Pettes "don't do that" in a relatively casual tone of voice as Leavy reached for Pettes' gun)); *cf. Johnson*, 620 F.3d at 690–91 (finding a seizure occurred when two officers "ordered [suspect] to stop," "yelled" at him, and told him to "stay right where he was").

True, Moten and Leavy's presence on either side of Pettes restricted his freedom of movement. But officers may "'position themselves immediately beside and in front of a suspect and even reach across a suspect' without this constituting a seizure, 'provided they leave a way out.'" *Turner*, 2024 U.S. Dist. LEXIS 115725, at *13 (citing *United States v. Smith*, 594 F.3d 530, 538 (6th Cir. 2010)). And Pettes' movement may have been restrained due to his positioning behind the passenger door of the Jeep, but "this was the natural result of his decision" to hide behind the door; "it says nothing about whether or not the police conduct at issue was coercive." *Florida v. Bostick*, 501 U.S. 429, 426 (1991).

Although a close call, the Court finds that Pettes was not seized within the meaning of the Fourth Amendment until after Leavy approached and saw the gun on Pettes' waist. Said another way, the *Terry* stop did not begin until *after* Leavy saw the gun. The Court proceeds from this conclusion to its analysis of whether this seizure was supported by reasonable suspicion.

### B. Reasonable Suspicion

"In the context of a Terry stop, 'the degree of suspicion' required . . . is quite low." *McCallister*, 39 F.4th at 373. While the concept of reasonable suspicion is often "elusive," *id.*, and cannot be "reduced to a neat set of legal rules," courts have been clear that this standard is "considerably less" than a preponderance of the evidence, *United States v. Sokolow*, 490 U.S. 1, 7 (1989). This analysis considers the totality of the circumstances, *Wardlow*, 528 U.S. at 123, and may rely on "commonsense judgments and inferences about human behavior," *id.* at 125, and inferences drawn by police officers from their "experience and specialized training," *United States v. Arvizu*, 534 U.S. 266, 273 (2002). "'Uncommon' or 'unique' facts are not required" to establish reasonable suspicion, *United States v. McCauley*, 548 F.3d 440, 444 (6th Cir. 2008), but the officer's suspicion must be sufficiently particularized to provide a "basis for suspecting the particular person stopped of criminal activity," *McCallister,* 39 F.4th at 374 (citing *United States v. Cortez*, 449 U.S. 411, 418 (1981)).

As an initial matter, carrying a concealed weapon is presumptively unlawful in Michigan. *See Patterson*, 2023 U.S. Dist. LEXIS 113797, at *3 (collecting cases); Mich. Comp. Law § 750.227(2) ("A person shall not carry a pistol concealed on or about his or her person . . . without a license to carry the pistol as provided by the law[,] and if licensed, shall not carry the pistol in a place or manner inconsistent with any restrictions upon such license."). "In other words, an individual carrying a concealed weapon is committing a crime unless the individual has a valid CPL." *United States v. Leverett*, No. 19-20098 (E.D. Mich. July 24, 2019), ECF No. 36; *see,*

*e.g.*, *Graham*, 627 F. Supp. 3d at 788 (finding that merely seeing the butt of a concealed pistol on a suspect's person created reasonable suspicion sufficient to stop him).  CPL holders bear the burden of proving they are lawfully carrying a concealed weapon by having their license with them "at all times" they are carrying, Mich. Comp. Law § 28.425f(1), and showing their license and ID to law enforcement upon request, *id.* § 28.425f(2)(a)–(b).

So the fact that Pettes (wrongly) claimed he had a CPL is therefore of little use to him: by failing to produce his CPL and ID when requested, Pettes was already in violation of Michigan law, Mich. Comp. Laws § 28.425(f)(2) (regulatory law requiring CPL holders to furnish their license and ID to police when asked), giving officers reasonable suspicion to investigate the existence of his CPL further.

In fact, this may have even given officers probable cause to arrest him. *See, e.g.*, *id.* § 750.227(2) (penal law criminalizing concealed carry of a pistol without following licensing requirements); *United States v. Freeman*, No. 21-20390, 2022 U.S. Dist. LEXIS 73179, at *5 (E.D. Mich. Apr. 21, 2022) ("The presence of a concealed pistol on the person is sufficient by itself to constitute probable cause to believe a person is committing the crime of illegally carrying a concealed weapon under Michigan law."); *see also Capozzoli*, 2022 U.S. Dist. LEXIS 137103, at *11–12 ("When Defendant indicated he did not have a CPL but did have a gun, the officers had probable cause to arrest Defendant."). But the Court need not determine whether officers could infer Pettes' possession was unlawful based on his failure to promptly provide a CPL (despite claiming to have one) because the officers had, at a minimum,

reasonable suspicion to stop him upon seeing the gun. *See, e.g.*, *Capozzoli*, 2022 U.S. Dist. LEXIS 137103, at *11 ("Having *seen* a concealed weapon, the officers had reasonable suspicion to investigate whether the Defendant in fact had a firearm on his person . . . .").

This Court has previously held, based on binding authority, that when an officer sees a concealed weapon (or weapon-shaped bulge) on an individual's person, plus some other suspicious behavior, that is sufficient to produce reasonable suspicion that the individual was involved in criminal activity. *Turner*, 2024 U.S. Dist. LEXIS 115725, at *15 (collecting cases); *United States v. Costner*, No. 23-20110, 2023 U.S. Dist. LEXIS 134245, at *14–16 (E.D. Mich. Aug. 2, 2023) (same). And here, Leavy had both observed the gun on Pettes' hip and observed other suspicious behaviors at the time Moten began detaining Pettes.

First the officers observed Pettes conduct a "retention check," an action that, in their experience, is commonly done by persons carrying concealed weapons. Second, the officers observed Pettes open the passenger door of the Jeep and draw himself nearer to the vehicle—which looked to officers like an effort to conceal his body. And as officers drew nearer to the Jeep, they saw Pettes "blade" or orient the right side of his body away from them, another apparent effort to conceal his waist. These suspicious movements upon seeing a marked squad car are precisely the kind of evasive movements the Sixth Circuit has deemed relevant to the reasonable suspicion analysis. *See, e.g.*, *Costner*, 2023 U.S. Dist. LEXIS 134245, at *14–16 (citing Sixth Circuit cases); *United States v. Faught*, No. 21-6123, 2022 WL 2813240, at *5

(6th Cir. July 19, 2022) ("[The Sixth Circuit has] recognized that if a suspect stands in a 'bladed' position by turning away from an officer as if to conceal something, that positioning can add to the reasonable suspicion that the suspect might have a weapon."); *Johnson*, 620 F.3d at 695 ("[W]e have considered the abruptness and other evasive characteristics of a suspect's departure upon noticing the police to determine whether his reaction contributes to reasonable suspicion." (collecting cases)); *United States v. Craig*, 306 F. App'x 256, 262 (6th Cir. 2009) (finding reasonable suspicion based on defendants' "abrupt change in direction upon [the officer's] arrival" and their roundabout, "seemingly evasive exit route from the parking lot").

Pettes points out that there are several innocuous explanations for his behavior. He argues that he may have "bladed" his body to move out of the way of oncoming traffic. He may have opened the passenger door of the vehicle to speak to its occupants or pick up his PlayStation. The retention check could have been a simple readjustment of his pants. Of course, each of these reasons may have been true. But "even entirely innocent behaviors may establish reasonable suspicion in some circumstances." *McCallister*, 39 F.4th at 374. (citing *Sokolow*, 490 U.S. at 9–10); *Hoover*, 682 F.3d at 492 ("[C]ourts and law enforcement officers must look beyond the possibility of innocent behavior to determine whether the facts support a reasonable suspicion of criminality."). And as the officers explained here, these behaviors, considered together, take a different shape, and gave the officers good reason, in their experience, to suspect Pettes was concealing a weapon.

23

Finally, that all of this took place in a high crime area is a relevant "plus" factor tipping the scales toward finding the officers' suspicion reasonable. *See, e.g.*, *Johnson*, 620 F.3d at 693–92 ("[P]resence in a high-crime location . . . 'may not, without more, give rise to reasonable suspicion,' but . . . may be considered in the totality of the circumstances."). Pettes points out that a police precinct encompasses several neighborhoods and cautions the Court against making overly broad generalizations about the communities therein. *See id.* at 693 (noting that "'labeling an area high-crime' raises special concerns of racial, ethnic, and socioeconomic profiling'" (quoting *United States v. Caruthers*, 458 F.3d 459, 467 (6th Cir. 2007))).

Fair enough. But as the officers explained during their testimony, their proactive patrol was intended to spot and deter criminal activity in the ninth precinct, an area known to have more shootings than anywhere else in the city. It follows that the area of Portlance Street in which they found Pettes was within a portion of the ninth precinct they deemed sufficiently "high crime" to warrant proactive patrol.

In sum, Leavy's observation of the concealed weapon on Pettes' hip, coupled with his evasive gestures (retention check and blading), and bolstered by his presence in a high-crime area, gave the officers reasonable suspicion to stop Pettes to investigate if he was carrying a concealed weapon.[2]

---

[2] The Court does not address whether the improper positioning of the Jeep (facing the wrong direction and toward oncoming traffic) gave the officers reasonable suspicion or even probable cause to stop him, as the government does not make that argument. (*See, e.g.,* ECF No. 26, PageID.80.) But the Court notes that Leavy testified that the positioning of the car, which constituted a "ticketable offense," added to his suspicion of Pettes. And "[a] police officer may stop a motorist when he possesses probable cause of a civil infraction or has reasonable suspicion of criminal activity."

## IV.

Finally, after giving Pettes ample opportunity to produce a CPL, his failure to do so gave officers probable cause to arrest him. *See, e.g.*, *United States v. Lamb*, No. 16-20077, 2016 U.S. Dist. LEXIS 105217, at *10–11 (E.D. Mich. July 6, 2016) ("Ample authority demonstrates that [Officer] Gardner had probable cause to arrest Lamb based upon his possession of the gun, and that Lamb carried the burden of producing proof that he had a CPL license. Lamb did not carry that burden because he never produced a CPL license."), *report and recommendation adopted*, 2016 U.S. Dist. LEXIS 104609 (E.D. Mich. Aug. 9, 2016). So Pettes' ultimate arrest, following the valid *Terry* stop, was also lawful.

## V.

The time between Leavy's sighting of the weapon in Pettes' waistband and Moten grabbing Pettes' arm is, admittedly, a matter of milliseconds, making the analysis of when officers had reasonable suspicion to *Terry*-stop Pettes, and when Pettes was actually stopped, a hairsplitting exercise. Indeed, it appears that the reasonable suspicion to stop Pettes manifested near simultaneously with the stop itself. But when confronted with close calls like this, precedent instructs this Court to not sift through evidence "in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *United States v. Cortez*,

---

*Pacheco*, 841 F.3d at 390. So too "police may extend a stop beyond the scope of what was originally permissible if 'something happened during the stop'" to give the officer reasonable suspicion that criminal activity is afoot. *United States v. Stepp*, 680 F.3d 651, 661 (6th Cir. 2012). Thus it is possible that the officers had reasonable suspicion to stop Pettes even before Leavy saw the gun.

449.U.S. 411, 418 (1981). And it is well recognized that "police officers are often forced to make split second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Dorsey,* 517 F.3d at 399. In light of this reality, the Supreme Court has admonished courts to "take care to consider whether the police are acting in a swiftly developing situation" and avoid "indulg[ing] in unrealistic second-guessing [of police conduct]." *Sharpe*, 470 U.S. at 686.

So, viewing the facts practically, as an officer would, and considering the "whole picture," *id.*, the Court finds the officers here acted quickly in response to a potentially dangerous circumstance—approaching a person thought to be armed with a concealed weapon, in the immediate vicinity of several bystanders. The officers' actions, while swift, were reasonably calculated to protect both themselves and the public. This is the bottom line that animates the foregoing analysis.

In sum: Officers had reasonable suspicion that Pettes was unlawfully carrying a concealed weapon after both seeing his suspicious gestures (retention check and blading) *and* a concealed weapon on his person. Almost simultaneously with the manifestation of that suspicion, the officers retrieved the weapon and seized Pettes. They then briefly detained Pettes in a reasonable manner to investigate whether Pettes had a CPL. At some time during that investigation, it became clear Pettes did not have a CPL. They confirmed this with a LEIN check. At that point, officers had probable cause to arrest Pettes.

For these reasons, Pettes' motion to suppress is DENIED.

IT IS SO ORDERED.

26

Dated: November 14, 2025

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE